IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| PAUL INNOCENZI, ) | |
| ) | CASE NO. 1:14-CV-453 |
| Plaintiff, ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE |
| ) | KENNETH S. McHARGH |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY ADMINISTRATION, ) | **MEMORANDUM OPINION &** |
| ) | **ORDER** |
| Defendant. ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 13). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Paul Innocenzi's ("Plaintiff" or "Innocenzi") application for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I. PROCEDURAL HISTORY

Innocenzi filed an application for a Period of Disability and Disability Insurance benefits on June 20, 2011. (Tr. 149-50). Plaintiff alleged he became disabled on May 20, 2011. (*Id.*). The Social Security Administration denied his claim initially and upon reconsideration. (Tr. 96-99, 104-07).

On April 12, 2012, Plaintiff filed a request for a hearing by an administrative law judge ("ALJ"). (Tr. 111-12). ALJ Susan Giuffre convened an administrative hearing on September 24,

2012, to evaluate Plaintiff's application. (Tr. 43-68). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Gene Burkhammer, also appeared and testified. (*Id.*).

On October 24, 2012, the ALJ issued an unfavorable decision, finding Innocenzi was not disabled. (Tr. 28-39). After applying the five-step sequential analysis,[1] the ALJ determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id*.). Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 19). The Appeals Council denied the request for review, making the ALJ's October 24, 2012, determination the final decision of the Commissioner. (Tr. 1-5). Plaintiff now seeks judicial review of the Commissioner's decision.

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1) If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2) If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3) If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4) If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5) Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on July 27, 1955, and was 55 years old as of his alleged onset date and 57 years old as of the ALJ's decision. (Tr. 47, 149).  As a result, Plaintiff was considered a "person of advanced age" for Social Security purposes. 20 C.F.R. § 404.1563(e).  Plaintiff completed high school. (Tr. 173).  He has past relevant work as a landscaper and rigger. (Tr. 64).

### B.  Medical Evidence[2]

On January 18, 2007, Plaintiff treated with Naryana Dasari, M.D., after a recent hospital visit. (Tr. 221).  Plaintiff explained that two months prior, he had a headache and later developed a seizure.  He recently experienced transient weakness of the left upper extremity, which resolved itself in two hours.  At the hospital, it was discovered that he had 50 percent narrowing of the right carotid artery and 80 percent narrowing of the left carotid artery. Upon physical examination, Plaintiff had no pedal edema, no tenderness of the calf muscles, normal deep tendon reflexes, good grip in both upper extremities, and a normal gait.  Dr. Dasari's impression was a history of a small stroke, carotid artery stenosis, hypertension, and hyperlipidemia. She ordered additional testing, copies of Plaintiff's medical records, and advised Plaintiff to continue taking aspirin, cholesterol medication, and anti-hypertensive medications. (*Id.*).

An April 2007 carotid artery scan confirmed the presence of severe stenosis (greater than 70 percent) on the right and moderate stenosis (between 50 and 70 percent) on the left. (Tr. 230).

On May 19, 2009, Innocenzi reported to Michael Scholonsky, M.D., that he broke his left ankle 23 years ago and currently could hardly walk on it. (Tr. 273).  Upon physical examination Plaintiff walked with a cane and had a noticeable limp.  There were multiple telangiectasias in

---

[2] The following recital of Plaintiff's medical record is an overview of the medical evidence pertinent to Plaintiff's appeal.  It is not intended to reflect all of the medical evidence of record.

the medial aspect of the left ankle, positive edema of the lateral aspect of the ankle with pain on palpation at the anterior talofibular ("ATF") and calcaneofibular ("CF") ligaments and pain at the end range of passive supination. Innocenzi refused to undergo an x-ray. The doctor noted that Plaintiff had knee surgery on the left leg, as well as back problems that affected that side. Dr. Scholonsky felt Plaintiff had some degenerative change but was unable to adequately make an assessment without an x-ray and a full physical examination. Plaintiff was prescribed Vicodin and instructed to follow up as needed. (*Id.*).

On May 16, 2011, Innocenzi presented to Dr. Dasari with complaints of back pain. (Tr. 229). Plaintiff was not experiencing palpitations or dizziness. He reported that he had stopped taking Lotrel because it was too expensive. Dr. Dasari's impression was hypertension, hyperlipidemia, and chronic alcoholism. She prescribed medication. (*Id.*). On September 6, 2011, Plaintiff again treated with Dr. Dasari, who observed that Plaintiff was not taking his medication, continued to smoke a pack of cigarettes per day, and continued to drink moderately. (Tr. 262). Innocenzi informed the doctor that he planned to see a vascular specialist about his carotid artery stenosis. Dr. Dasari instructed him to stop drinking and smoking. (*Id.*).

On September 21, 2011, state agency consultative examiner Adi Gerblich, M.D., performed a physical examination of Innocenzi. (Tr. 244-46). Plaintiff told Dr. Gerblich that he had hypertension, high cholesterol, gastroesophageal reflux disease, and anxiety, and the doctor accepted these diagnoses. (Tr. 244-45). Innocenzi also explained that he experienced a transient ischemic attack ("TIA") four years prior, for which he was admitted to the hospital and placed on aspirin. (Tr. 244). Plaintiff indicated that he had about three TIA episodes since that time. During the episodes, his left arm would become totally numb and he would lose all sensation, but sensation and functioning returned to normal after about an hour. Innocenzi also stated that he

suffered from two episodes of temporary right eye blindness, which lasted about 10 minutes each. Plaintiff indicated that Dr. Dasari recommended a carotid ultrasound. Plaintiff also claimed he required a carotid endarterectomy, but he had lost his insurance coverage and did not follow up on the recommendation. Plaintiff told Dr. Gerblich that he experienced leg pain and muscle cramps when he walked about one block, had difficulty tying his shoes due to shortness of breath when he bent over, and most of his joints hurt him. (*Id.*).

Upon physical examination, Dr. Gerblich recorded overall unremarkable findings. A carotid exam showed no bruit, Plaintiff's chest produced good breath sounds bilaterally, there was no heart murmur, and his extremities had no peripheral edema. Plaintiff's reflexes were intact. His upper and lower body muscle powers, hand grasp and manipulation, range of motion in all joints, and gait were normal. (*Id.*). Dr. Gerblich concluded that Plaintiff suffered from hypertensive arteriosclerotic cardiovascular disease, and there was "[n]o evidence for limitation in sedentary activity." (Tr. 245).

On September 27, 2011, state agency reviewing physician Nick Albert, M.D., conducted a review of the record, which included Dr. Gerblich's disability evaluation. (Tr. 74-76). Dr. Albert opined that Plaintiff could lift or carry up to 25 pounds frequently and 50 pounds occasionally; and stand, sit, or walk for 6 hours in an 8 hour workday. The doctor found that Plaintiff's "postural limitations" were that he could never climb ladders, ropes, or scaffolds; but could climb ramps or stairs, balance, stoop, kneel, crouch, or crawl frequently. Dr. Albert assigned the following "environmental limitations": Plaintiff must avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity; and avoid moderate exposure to hazards, like machinery and commercial driving. (*Id.*).

On January 10, 2012, Plaintiff saw Dr. Dasari for a follow up regarding his moderate hypertension and his hyperlipidemia. (Tr. 263). Dr. Dasari commented that Innocenzi's compliance had been fair: he skipped some medication doses and did not follow a diet and exercise regime. Upon physical examination, Dr. Dasari noted that Plaintiff was moderately obese, was in no apparent distress, and smelled of alcohol. (Tr. 264). He had no carotid bruits, clear lungs, and a regular heart rate and rhythm. The doctor made no changes to Innocenzi's medication regimen, but advised him to quit smoking and drinking alcohol. (*Id.*).

On March 2, 2012, state agency physician Kourosh Golestany, M.D., reviewed the evidence and affirmed Dr. Albert's opinion, except that Dr. Golestany limited Plaintiff's exposure to humidity to a moderate level. (Tr. 88-90).

Plaintiff returned to Dr. Dasari on June 23, 2012. (Tr. 271). The doctor commented that Plaintiff's compliance with treatment had been poor, in that he had skipped medication doses, did not follow a diet and exercise regime, and did not follow up as directed. A physical examination revealed no significant changes since Innocenzi's last visit. (Tr. 272).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirement of the Act on September 30, 2012.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 20, 2011, through her date last insured of September 30, 2012.

3. Through the date last insured, the claimant had the following severe impairment: bilateral carotid artery stenosis.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) except that he cannot climb ladders, ropes, or

6

scaffolds, and must avoid all exposure to hazards (i.e. unprotected heights, industrial machinery, and commercial driving).

6. Through the date last insured, the claimant was unable to perform any past relevant work.

7. The claimant was born on July 27, 1955, and was 55 years old, considered a "person of advanced age," on May 20, 2011, the date he alleges his disability began.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because the Medical-Vocational Guidelines support a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was not under a disability, as defined in the Act, at any time from May 20, 2011, the alleged onset date, through September 30, 2012, the date last insured.

(Tr. 30-38) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

### A. Whether substantial evidence supports the ALJ's treatment of medical source opinions and Plaintiff's RFC

Plaintiff argues that substantial evidence does not support the RFC, because the ALJ incorrectly failed to fully adopt the opinions of one-time examiner Dr. Gerblich and state agency reviewing physicians, Drs. Albert and Golestany. According to Innocenzi, the ALJ did not articulate sufficient reasons in support of her decision to discredit these opinions.

It is well-established that for an ALJ's decision to stand, the ALJ is not required to discuss every piece of evidence in the record. *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F.

8

App'x 661, 665 (6th Cir. 2004). Nevertheless, if the opinion of a medical source contradicts the RFC finding, an ALJ must explain why he did not include its limitations in the determination of the RFC. *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."). Social Security Ruling 96-8p explains, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

**1. One-time consultative examiner**

Dr. Gerblich performed a one-time physical examination of Plaintiff and concluded that Plaintiff suffered from hypertensive arteriosclerotic cardiovascular disease, but there was "[n]o evidence for limitation in sedentary activity." (Tr. 245). The ALJ afforded "some weight" to Dr. Gerblich's opinion. (Tr. 35). Upon review, the undersigned finds the following explanation provided by the ALJ as adequate grounds for partially discrediting Dr. Gerblich:

> In light of the recorded findings of [Dr. Gerblich's] exam, which revealed no objective signs of physical impairment (e.g., normal range of motion, no neurological deficits, normal gait), Dr. Gerblich does not seem to be expressing an opinion that the claimant could perform *no more than* sedentary activity. If that were the case, the exam would fail to support such a limitation. Rather, Dr. Gerblich appears to be expressing an opinion that the claimant has no impairments that limit his ability to perform sedentary work, without expressing any opinion of the claimant's ability to perform work at higher levels of exertion. Nonetheless, Dr. Gerblich's statement does express his opinion that the claimant lacks any significant postural, environmental, or manipulative limitations of the sort that would interfere with sedentary work, a conclusion that is consistent with the objective evidence.

(Tr. 35-36).

9

Plaintiff essentially argues that Dr. Gerblich recommended a limitation to sedentary work, which the physician based on Plaintiff's severe and moderate carotid artery stenosis, and the ALJ erred in finding otherwise. However, the ALJ reasonably concluded that Dr. Gerblich opined Plaintiff was not limited in his ability to perform sedentary work, and was silent about Plaintiff's ability to do work at higher levels of exertion, such as light or medium work. (Tr. 35-36). Additionally, the state agency reviewing physicians' opinions support the ALJ's interpretation of Dr. Gerblich's opinion, as both reviewers attributed great weight to Dr. Gerblich when formulating their opinions that Plaintiff could perform medium work. (Tr. 74, 88). Alternatively, the ALJ appropriately found that if Dr. Gerblich had opined that Plaintiff was limited to sedentary work, the results of Dr. Gerblich's physical examination failed to support such a limitation. (Tr. 35). The regulations instruct the ALJ to consider how consistent a medical opinion is with the record and award weight accordingly. 20 C.F.R. § 404.1527(c)(4). Dr. Gerblich's physical examination revealed no objective signs of physical impairment, but instead, showed normal upper and lower body muscle powers, hand grasp and manipulation, range of motion in all joints, and gait. (Tr. 244). Such findings did not support a limitation to sedentary work. Accordingly, the ALJ reasonably gave only some weight to Dr. Gerblich's opinion because she agreed Plaintiff was unlimited in his ability to perform sedentary work.

Plaintiff also contends that the ALJ ought to have re-contacted Dr. Gerblich to clarify his opinion or have requested that a medical expert expound on the functional effects of carotid artery stenosis. However, an "ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (*citing* 20 C.F.R. § 404.1517) ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled

10

or blind, we may ask you to have one or more physical or mental examinations or tests.")). While the ALJ has a duty to ensure that a reasonable record has been developed, *see Johnson v. Sec'y of Health & Human Servs.*, 794 F.2d 1106, 1111 (6th Cir. 1986), it is incumbent upon the claimant to provide an adequate record upon which the ALJ can make an informed decision regarding his disability status. *See Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). An ALJ is not required to supplement the record with additional evidence unless the record, as it exists, is insufficient to assess a claimant's residual functional capacity or otherwise resolve his claims. *Stevens v. Comm'r of Soc. Sec.*, No. 1:12-CV-977, 2014 WL 357307, at *6 (W.D. Mich. Jan. 31, 2014). While reviewing Innocenzi's application, the ALJ had treatment notes from primary care physician Dr. Dasari, the results of various physical examinations, reports from state agency reviewing physicians and the consultative examiner, and Innocenzi's testimony at the hearing. This evidence, combined with the lack of significant treatment and lack of compliance with treatment, were sufficient to present the ALJ with a picture of Plaintiff's physical functioning such that the ALJ did not error in her decision not to obtain further evidence.

**2. State agency reviewing physicians**

Drs. Albert and Golestany limited Plaintiff to medium work with the addition of postural and environmental limitations. (Tr. 74-76, 88-90). The ALJ accepted the reviewers' opinions to the extent that Plaintiff's bilateral carotid artery stenosis reasonably subjected him to a risk of stroke or transient ischemic attack that limited him to medium exertional activities, which did not require him to climb ladders, ropes, or scaffolds, or work around hazards (i.e., unprotected heights, industrial machinery, and commercial driving). (Tr. 36). The ALJ added that that she gave the reviewers' opinions limited weight because they disregarded significant evidentiary

deficits to conclude that Plaintiff had severe back and ankle impairments, which rendered their opinions less persuasive overall. (Tr. 36, 72, 86).

Plaintiff argues the ALJ erred in giving only "limited weight" to the opinions of the reviewing physicians. Innocenzi asserts that the state agency physicians did not indicate what impairments supported their decisions to limit him to (1) climbing ramps and stairs, balancing, stooping, kneeling, and crawling only frequently, and (2) avoiding concentrated exposure to extreme cold/heat, wetness, and humidity.[3]  As a result, Plaintiff maintains that the ALJ's decision to discredit the reviewers' opinions because they found he suffered from severe back and ankle impairments is flawed.

The ALJ articulated sufficient grounds to question the state agency physicians' recommendation for postural limitations related to climbing ramps and stairs, balancing, stooping, kneeling, and crawling.  The state agency physicians based these limitations, in part, on their "findings of fact and analysis of evidence" ("FOFAE"). (Tr. 75-76, 89-90).  Under their FOFAE, both Drs. Albert and Golestany noted Plaintiff's complaints of back and ankle pain. (Tr. 72, 86).  Additionally, the physicians explained that the postural limitations were based on Plaintiff's previous TIAs and carotid artery stenosis. (Tr. 75-76, 89-90).

The ALJ provided considerable analysis regarding the lack of evidence to support Plaintiff's ankle and back impairments and limitations arising therefrom.  For instance, the ALJ recounted that Dr. Dasari did not recommend treatment for back pain. (Tr. 31).  Additionally, Dr. Gerblich's physical examination showed a normal gait, as well as no neurological, muscular, or range of motion deficits consistent with a back impairment. (*Id.*).  As to Plaintiff's ankle problem, the ALJ observed that Plaintiff complained of ankle pain to Dr. Scholonsky for the first

---

[3] Plaintiff also notes that the state agency physicians limited him to avoiding moderate exposure to hazards.  The ALJ accounted for this limitation in the RFC, which provides that Plaintiff must avoid all exposure to hazards. (Tr. 34).

12

time since spraining his ankle 23 years prior. (*Id.*). Plaintiff refused an x-ray and the doctor indicated that he could provide no further treatment as a result. Dr. Gerblich's subsequent physical examination did not produce objective evidence of a significant abnormality due to ankle impairment. (*Id.*). When formulating the RFC, the ALJ also observed that numerous physical examinations revealed normal muscle strength, full range of motion, and no neurological deficits, all of which undermined the physical limitations at issue. (Tr. 35). Accordingly, the ALJ's decision to question the state agency physicians' postural limitations is substantially supported.

Next, the undersigned will turn to the state agency reviewers' recommended environmental limitations. (Tr. 75-76, 89-90). The reviewers' indicated that they based these limitations on the FOFAE, Plaintiff's previous TIAs, and his carotid artery stenosis. (Tr. 75-76, 89-90). The ALJ indicated that she questioned the state agency physicians' opinions overall because they deemed Plaintiff's back and ankle impairments severe, and credited limitation arising out of Plaintiff's carotid artery stenosis only to the degree that those limitations were incorporated into the RFC. (Tr. 36).

When discussing the state agency reviewers' opinions, the ALJ could have made her explanation for rejecting the limitations at issue more thorough. Nevertheless, the ALJ's decision as a whole provides adequate insight as to why the environmental limitations were not adopted. For example, the state agency physicians indicated they based these limitations largely on Plaintiff's TIAs and carotid artery stenosis. However, the ALJ indicated that Plaintiff's course of treatment for carotid artery stenosis was not such that it would appear he was disabled. (Tr. 35). Plaintiff underwent only routine maintenance treatment with his primary care physician. (*Id.*). Additionally, the ALJ explained that Plaintiff self-reported a number of TIAs

13

that were not documented in the record, which indicated that the TIAs were not severe enough to warrant emergency treatment. (*Id.*).  The ALJ also highlighted that Plaintiff did not fully comply with taking prescribed medication for his artery disease, nor did he heed Dr. Desari's persistent advice to stop drinking alcohol and smoking. (*Id.*).  Accordingly, the ALJ's opinion shows that the evidence failed to support the degree of environmental limitations, which the state agency reviewers' recommended based on Plaintiff's TIAs and carotid artery stenosis.

Even assuming that the ALJ erred with regard to her treatment of the state agency reviewers' opinions, any error would have been harmless.  During the administrative hearing, the ALJ posed a hypothetical question to the VE that limited Plaintiff to light work[4] and sufficiently accounted for the limitations recommended by the state agency reviewers, as well as the limitations included in the controlling RFC. (Tr. 65).  In response to this hypothetical question, the VE identified jobs that existed in significant numbers in the national economy. (Tr. 66).  Thus, if the ALJ had credited the state agency reviewers' postural and environmental limitations and incorporated them into the RFC, there would have been jobs available that Plaintiff could perform.

Lastly, Plaintiff maintains that the RFC is in err because the ALJ did not grant substantial weight to any of the medical opinions, but instead substituted her own opinion for those of the state agency physicians.  It is correct that an ALJ "may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by medical evidence." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006)).  Yet, the ALJ reserves the right to decide certain pertinent issues, such as the claimant's RFC, based on her evaluation of

---

[4] The functional capacity to perform medium work includes the functional capacity to perform light work as well. 20 C.F.R. § 404.1567(c).

14

the medical and non-medical evidence. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "An ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (internal citations omitted). Furthermore, requiring the ALJ to "base her RFC finding on a physician's opinion, "would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd*, 531 F. App'x at 728 (*quoting* SSR 96-5p, 1996 WL 374183 (July 2, 1996)).

Here, the ALJ did not entirely reject the medical source opinions, but instead credited them to the extent that they were consistent with the record. The ALJ supported her decision with analysis and by addressing various pieces of evidence, including Plaintiff's treatment history, the results of physical examinations and objective tests, and Plaintiff's testimony. Accordingly, the ALJ properly exercised her discretion to weigh the evidence and determine the RFC such that remand is not appropriate.

    **B. Whether the ALJ should have obtained VE testimony to support the finding at step five of the sequential evaluation**

Innocenzi also argues that the ALJ's step five finding is not supported by substantial evidence. More specifically, Plaintiff maintains that the ALJ failed to question a VE about the effects of the following limitations that were incorporated in the RFC: (1) no climbing ladders, ropes, or scaffolds, and (2) avoiding all exposure to hazards (i.e., unprotected heights, industrial machinery, and commercial driving). According to Plaintiff, the ALJ's reliance on the Medical-Vocational Guidelines ("the Grids") to conclude that the limitations would not significantly affect the medium occupational base was insufficient. He requests that the case be remanded for

testimony by a VE in order to determine the available of jobs given his impairments as reflected in the RFC.

At the fifth and final step of the disability analysis, the ALJ must determine whether, in light of the claimant's RFC, age, education, and past work experience, the claimant can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(v). At this step, the burden shifts to the commissioner to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs. *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 799 (6th Cir. 2004) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).

Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question. *Workman*, 105 F. App'x at 799 (quoting *Varley*, 820 F.2d at 779). Additionally, the Commissioner may meet this burden by reference to the Grids, unless the claimant suffers from nonexertional limitations that significantly limit the range of work permitted by his or her exertional limitations. *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 142 (6th Cir. 1987) (citing *Cole v. Secretary of Health & Human Services*, 820 F.2d 768, 771-72 (6th Cir. 1987)). "Reliance upon the grids in the presence of nonexertional limitations requires reliable evidence of some kind that the claimant's nonexertional limitations do not significantly limit the range of work permitted by his exertional limitations." *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987) (citing cases).

In the present case, Plaintiff's arguments lack merit. The ALJ accurately cited to SSR 83-14 for the proposition that a limitation precluding any use of ladders and scaffolding would

16

not significantly affect the occupational base of medium work. (Tr. 38), SSR 83-14, 1983 WL 31254, at *5 (Jan. 1, 1983). The ruling provides reliable evidence that Plaintiff's limitations as they related to using ladders and scaffolds did not significantly erode the occupational base.

The ALJ also relied on SSR 83-14 to find that limitations precluding exposure to commercial driving, unprotected heights, and industrial machinery would not significantly affect the medium occupational base. (Tr. 38). SSR 83-14 states that "[t]he need to avoid environments which contain objects or substances commonly known not to exist in most workplaces would be an obvious example of a restriction which does not significantly affect the medium occupational base." 1983 WL 31254, at *5. SSR 83-14 does not provide examples of what might fall under the category of uncommon workplace objects or substances. The ALJ concluded that commercial driving, unprotected heights, and industrial machinery, qualified as such and would not impact the occupational base.

Regardless of whether or not the ALJ was correct in her conclusion, substantial evidence supports the finding at step five. That is because during the administrative hearing, the ALJ posed a hypothetical question to the VE that included a limitations to no commercial driving and avoiding all exposure to hazards considered unprotected heights and industrial machinery. (Tr. 65). The hypothetical question also limited Plaintiff to light work, and accounted for all of the limitations included in the RFC. (*Id.*). In response to the question, the VE identified a significant number of jobs in the national economy. (Tr. 66). As a result, to remand in order to question a VE regarding the impact of these limitations would be a futile endeavor. Courts are not required to demand further review of agency action if remand would be a "useless formality." *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (*citing NLRB v. Wyman-Gordon*

*Co.*, 394 U.S. 759, 766 n. 6 (1969)).  Accordingly, Plaintiff's argument fails to establish that remand is appropriate.

## VII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Kenneth S. McHargh  
Kenneth S. McHargh  
United States Magistrate Judge

Date: February 24, 2015.